Allison W. BROWN, Jr., Plaintiff,

v.

SUPREME COURT OF VIRGINIA et al.,
Defendants.

Roger W. TITUS, Plaintiff,

v.

SUPREME COURT OF VIRGINIA et al.,
Defendants.

Civ. A. Nos. 700–71–R, 43–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

June 5, 1973.

550

Allison W. Brown, Jr., pro se (Robert M. Alexander, Arlington, Va., and David Carliner, Washington, D. C., on brief).

Stuart H. Dunn, Asst. Atty. Gen., of Va. (Andrew P. Miller, Atty. Gen., of Va., Richmond, Va., on brief), for defendants.

Francis C. Lee, Richmond, Va. (McCaul, Grigsby & Pearsall, Richmond, Va., on brief), for intervenor Virginia State Bar.

Roger W. Titus, pro se (Philip J. Hirschkop, Alexandria, Va., William W. Greenhalgh, Rockville, Md., and Leonard J. Keilp, Arlington, Va., on brief, for plaintiff).

Robert P. Dwoskin, Charlottesville, Va., and Herbert A. Rosenthal, Jr., Washington, D. C., on brief, for American Civil Liberties Union, intervenor.

Before BRYAN, Circuit Judge, and LEWIS and MERHIGE, District Judges, in No. 700–71–R.

Before BRYAN, Circuit Judge, and HOFFMAN and MERHIGE, District Judges, in No. 43–72–R.

WALTER E. HOFFMAN, District Judge, in No. 43–72–R.

PER CURIAM in No. 700–71–R.

■ These cases involve an area of state-federal. relations; namely, the right of a state to establish and administer standards for admission to the bar —a field into which the federal court should be especially reluctant and slow to enter, but one in which there is a duty to investigate in appropriate cases. Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Konigsberg v. State Bar, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); Douglas v. Noble, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590 (1923); Willner v. Committee on Character, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

The actions, originally filed against the Supreme Court of Appeals of Virginia (later renamed the Supreme Court of Virginia) and the individual justices thereof, were consolidated for hearing. The Virginia State Bar was granted leave to intervene. The American Civil Liberties Union requested leave to intervene as a party plaintiff in No. 43–72–R, but the request came too late to permit active participation although we have considered the brief filed. In due time the Supreme Court of Virginia filed a motion for abstention which, after hearing, was granted on May 17, 1972. Following petitions for reconsideration filed by each plaintiff, the Supreme Court of Virginia, in unanimous opinions written by Justice Carrico, denied the applications. Application of Brown, 213 Va. 282, 191 S.E.2d 812, decided October 9, 1972, and Application of Titus, 213 Va. 289, 191 S.E.2d 798, decided October 9, 1972.

■ Abstention did not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 416, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Apparently the action of this three-judge court was strictly in accordance with the procedure approved by the Supreme Court of the United States. American Trial Lawyers Ass'n v. New Jersey Supreme Court, 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973).

The facts are sufficiently stated in the opinions of the Supreme Court of Virginia. Suffice it to say, these actions attack the validity of Rule 1A:1, reading as follows:

"Rule 1A:1. *Foreign Attorneys— When Admitted to Practice in this State Without Examination.* "Any person who has been admitted to practice law before the court of last resort of any state or territory of the United States or of the District of Columbia may file an application to be admitted to practice law in this Commonwealth without examination, if counsel licensed to practice here may be admitted to practice there without examination.

"The applicant shall:

"(1) File with the clerk of the Supreme Court at Richmond an application, under oath, upon a form furnished by the clerk.

"(2) Furnish a certificate, signed by the presiding judge of the court of last resort of the jurisdiction in which he is entitled to practice law, stating that he has been so licensed for at least five years.

"(3) Furnish a report of the National Conference of Bar Examiners concerning his past practice and record.

"(4) Pay a filing fee of fifty dollars.

"Thereafter, the Supreme Court will determine whether the applicant:

"(a) Is a proper person to practice law.

"(b) Has made such progress in the practice of law that it would be unrea-

sonable to require him to take an examination.

"(c) Has become a permanent resident of the Commonwealth.

"(d) Intends to practice full time as a member of the Virginia bar.

"In the determination of these matters the Supreme Court may call upon the applicant to appear personally before a member of the Court or its executive secretary and furnish such information as may be required.

"If all of the aforementioned matters are determined favorably for the applicant, he shall be notified that some member of the Virginia bar who is qualified to practice before the Supreme Court may make an oral motion in open court for his admission to practice law in this Commonwealth.

"Upon the applicant's admission he shall thereupon in open court take and subscribe to the oaths required of attorneys at law, whereupon he shall become an active member of the Virginia State Bar."

## THE BROWN CASE—NO. 700–71–R

■ Brown, a member of the bar of the United States Court of Appeals for the District of Columbia, is a permanent resident of Virginia. However, he is employed on a full-time basis as a Supervisory Attorney in the Appellate Court Branch of the National Labor Relations Board, Washington, D. C. While his original application indicated that he intended to practice full time as a member of the Virginia bar, subsequent correspondence clearly revealed that he did not intend to resign his employment and, if admitted, he did not intend to practice

full time as a member of the Virginia bar.[1] Accordingly, Brown was advised that his application had been refused because of his failure to comply with Rule 1:5(4)(d), now Rule 1A:1(4)(d).

## THE TITUS CASE—NO. 43–72–R

Titus, a member of the bar of the State of Maryland, maintains one office in Rockville, Montgomery County, Maryland, where he also resides, and a second office in the District of Columbia. He concedes that he has no intention of becoming a resident of Virginia. The Supreme Court of Virginia refused his application by reason of his stated intention not to comply with Rule 1A:1(4)(c), requiring permanent residency as to an applicant for admission to the bar without examination.[2]

■■ Since a judgment of the Supreme Court of a state expresses "the power of the state as a whole," Rippey v. Texas, 193 U.S. 504, 509, 24 S.Ct. 516, 517, 48 L.Ed. 767, Skiriotes v. Florida, 313 U.S. 69, 79, 61 S.Ct. 924, 85 L.Ed. 1193, we must examine the rulings for the purpose of determining whether they are arbitrary or discriminatory, and hence in violation of the Fourteenth Amendment. We start with the accepted premise that the admission to practice the legal profession before the courts of a particular state belongs to that state. As stated by Mr. Justice Black in Konigsberg v. State Bar, *supra,* "We recognize the importance of leaving States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner nor in such way as to impinge on the freedom of political expression or association."

---

1. Rule 1A:3 (formerly Rule 1:5.2) provides that if an attorney who has been admitted to practice law without examination no longer satisfies the full-time practice requirement, his license may be revoked. Brown also attacks Rule 1A:3. The Supreme Court of Virginia saw no reason to consider Rule 1A:3 in light of Brown's statement that he did not intend to practice full time. For the same reasoning, we do not reach this point.

2. We do not reach a possible additional ground for denial under Rule 1A:1(4)(d) requiring Titus to practice full time as a member of the Virginia bar. We have serious doubts as to whether an attorney, already maintaining two law offices in separate jurisdictions, can meet the requirement in opening a third law office.

Many states adhere to the residency requirement as a condition to admission upon motion without examination. Maryland, the home state of Titus, apparently requires a permanent residence, an intention to practice law, and an intention to maintain a law office or teach the profession. By reason of its unique situation, the District of Columbia at one time had no residency requirement but did require five years of practice in a state. Effective April 1, 1972, the District Court rules were modified by Rule 93 providing for admission if the applicant maintains a law office in the District of Columbia or a "contiguous area" in the Maryland counties of Montgomery or Prince Georges, in the Virginia counties of Arlington or Fairfax, or in the City of Alexandria. However, the right to enter an appearance without District of Columbia counsel is limited to those who maintain an office in the District except, with respect to those maintaining an office in the contiguous area but not in the District, they may note an appearance without local counsel only if a member having an office within the District of Columbia and not in the contiguous area is permitted to appear, file pleadings and practice in the courts of such contiguous area without being required to join of record an attorney having an office within the contiguous area. No specific period of prior practice in any state is required. In fact, only Florida, Georgia, Louisiana and the District of Columbia fail to specify any residency requirement for admission to practice on motion without examination. See Desk Book, Am.Jur. (2d), 1972 Cumulative Supplement, Doc. No. 94. Ten states require an examina-

tion and refuse to recognize reciprocity. Some of these states also require residency for the purpose of taking the examination. We must reject the argument of plaintiffs that the requirements in Virginia are more stringent than in other states.

It is well to note what these cases do not hold. At the outset it can be said without fear of contradiction that they do not pertain to the moral fitness and character of the applicants. The reports from the National Conference of Bar Examiners with respect to the past practice and record of the applicants were favorable. The question of the right to practice in a federal court is not at issue. We are not concerned with the highly specialized practice such as patent or antitrust law. Nor do these cases prohibit either applicant from appearing and participating in cases in Virginia courts in company with a Virginia resident attorney. Rule 1A:4; see also § 54–42, Code of Virginia 1950 as amended. As to Brown, he is eligible to take the Virginia bar examination and, if successful, he would then come within a different rule as to his entitlement to practice law in Virginia. Brown has not sought leave to take the examination. The Supreme Court of Virginia has indicated its willingness to certify Brown contemporaneous with the receipt of a statement that he intends to devote full time to the practice of law in Virginia, thereby eliminating any issue of "enforced idleness."

The right to practice law in Virginia is governed by statute as supplemented by the Rules of the Supreme Court of Virginia.[3] As to any applicant seeking to take the bar examination, the applica-

---

3. Sec. 54–42 of the Code of Virginia 1950, as amended, reads:
 "The following persons may practice law in this State:
 "All persons who have heretofore obtained, or may hereafter obtain, a license to so practice under the laws of this State, and whose license has not been revoked, and who have paid the license tax prescribed by law.

"Any person duly authorized and practicing as counsel or attorney at law in any state or territory of the United States, or in the District of Columbia, may for the purpose of attending to any case he may occasionally have in association with a practicing lawyer of this State practice in the courts of this State, in which case no fee shall be chargeable against such nonresident attorney."

tion requires, among other statements, that the applicant be a resident of the state *at the time his application to take the examination was filed* with the Board of Bar Examiners and that he intends to continue as a resident of this state *to the time of taking the examination for which he applies.* § 54–60, Code of Virginia 1950, as amended.

The Virginia State Bar is an integrated bar and all practicing attorneys must be members thereof. It provides for the payment of annual dues for active and associate (inactive) members. It follows that, if an applicant successfully *passes the bar examination,* thereafter leaves the state, but continues to maintain his active membership in the integrated bar, he is still entitled to practice law in Virginia.

■ The same rule does not apply to foreign attorneys seeking admission by reciprocity. In addition to the provision permitting a foreign attorney to participate in an occasional case in association with a Virginia attorney, § 54–67 grants to the Supreme Court of Virginia the *discretion* to grant a certificate without examination to any lawyer who has practiced before the court of last resort of any state, territory, or the District of Columbia for *three* years. The Supreme Court Rule requires *five* years but the conflict is not pertinent to these cases. Practicing law without being duly authorized or licensed constitutes a misdemeanor under § 54–44 of the Code of Virginia 1950. The authority to define the practice of law is delegated to the Supreme Court of Virginia pursuant to § 54–48, although it is universally recognized that the highest court of the state may prescribe rules relating to admissions to the bar even in the absence of a statute. The admission or exclusion of an attorney is not the exercise of a mere ministerial power. It is the exercise of judicial power and the admission of an attorney may, with propriety, be entrusted to the courts. Ex parte Garland, 4 Wall. 333, 378–379, 18 L.Ed. 366 (1866).

Apparently not presented by the plaintiffs to the Supreme Court of Virginia is their argument that approximately 26% of the successful applicants in taking the bar examination are no longer residents of Virginia, yet they are carried on the rolls of the Virginia State Bar as practicing attorneys. Thus, they argue, the plaintiffs are denied their rights under the Equal Protection Clause of the Fourteenth Amendment. There are several answers to this contention but, as previously noted, there is no statute or rule requiring the deletion of their names as attorneys as long as they continue to maintain their membership in the Virginia State Bar. The rather large percentage of attorneys passing the bar examination but now giving out-of-state addresses is occasioned by their attendance at the four law schools in Virginia where, prior to graduation, they certify at the time of making the application that they are *then* residents of Virginia and that they will continue as residents *to the time of taking the examination.*

■■ However, the final answer to plaintiffs' contention is dependent upon whether the Supreme Court of Virginia has the constitutional right to separately classify applicants taking the bar examination and those foreign attorneys who seek admission by comity or reciprocity. We agree with the Supreme Court of Virginia that there is a rational basis for making separate classifications. "The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities different from the others. The test is whether the difference in treatment is an invidious discrimination." Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 93 S.Ct. 1001, 35 L. Ed.2d 351 (1973). Quantitatively and qualitatively there is a solid basis for the distinction drawn. We are not here concerned with the wisdom of the Rule under attack and the Equal Protection Clause does not countenance speculative probing into the purposes of the Rule as long as it is not plainly arbitrary or dis-

criminatory. McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). Nor need we concern ourselves with the primary or secondary purpose for the Rule.[4] As Mr. Justice Powell said in *McGinnis, supra:*

"Yet our decisions do not authorize courts to pick and choose among legitimate legislative aims to determine which is primary and which subordinate. Rather, legislative solutions must be respected if the 'distinctions drawn have some basis in practical experience,' South Carolina v. Katzenbach, 383 U.S. 301, 331, 86 S.Ct. 803, 820, 15 L.Ed.2d 769 (1966), or if some legitimate state interest is advanced, Dandridge v. Williams, 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). So long as the state purpose upholding a statutory class is legitimate and nonillusory, its lack of primacy is not disqualifying.

"When classifications do not call for strict judicial scrutiny, this is the only approach consistent with proper judicial regard for the judgments of the Legislative Branch. The search for legislative purpose is often elusive enough, Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), without a requirement that primacy be ascertained. Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute."

By analogy we conclude that Rule 1A:1 draws a distinction which has a solid basis in practical experience. It is conceded by all parties that Virginia could prohibit any foreign attorney from practicing in Virginia at anytime, or could require any attorney to pass the state bar examination before being permitted to practice, Kovrak v. Ginsburg, 358 U.S. 52, 79 S.Ct. 95, 3 L.Ed.2d 46 (1958), dismissing for want of a substantial federal question the appeal from 392 Pa. 143, 139 A.2d 889. Aside from the lack of reciprocity in the Titus case, as Maryland would not permit a Virginia resident attorney to be admitted to practice *generally* in the Maryland courts under like circumstances, we feel that practical experience dictates that attorneys, admitted to practice in Virginia by reciprocity, should be required to maintain a residence therein and, in addition, devote their full time to the practice of the profession to the end that they may better serve the public and the proper administration of justice. We also feel that, with respect to Brown, his efforts to "moonlight," while continuing his full-time employment with the National Labor Relations Board, should be sufficient to deny him the right to admission by reciprocity.

We fully realize that there are some attorneys who were licensed without examination, who now maintain out-of-state addresses, and who, in all probability, are not maintaining a permanent residence in Virginia and practicing full time as a member of the Virginia bar. The effective date of the Rule requiring residence and full-time practice was May 1, 1961. As of December 20, 1972, it appears that 96 members had been licensed by reciprocity prior to May 1, 1961, and 41 attorneys were licensed without examination since that date. Complaint is made of the fact that nothing has been done to revoke the licenses of the 41 attorneys. There is evidence in the record as to two revocations (one of which resulted in the attorney thereafter successfully passing the bar examination) where the attorneys resided in Virginia but apparently failed to meet the continuing full-time practice requirement. But the difficulties with enforcing the Rule do not support the right of any foreign attor-

---

4. Plaintiffs argue that the purpose of the Rule is to create a monopoly on the legal business for Virginia resident attorneys devoting their full time to the practice of law.

ney to be admitted to practice.[5] The Virginia State Bar may have been lax in its enforcement efforts but this in no sense renders the Rule unconstitutional. Until and unless the integrated bar calls the matter to the attention of the Supreme Court of Virginia, there is nothing that can be done unless a complaint is filed.[6] Moreover, we have no accurate history of the 41 attorneys who fall within that category and are guided only by the fact that, on the rolls of the Virginia State Bar, they carry an out-of-state mailing address.[7]

We are not unmindful of the residency requirements which have fallen by the wayside.[8] We should first note that Rule 1A:1 does not require that a foreign attorney seeking admission to practice law in Virginia undergo any waiting period. His "permanent" residence in Virginia may be contemporaneous with the granting of his certificate to practice law. The authorities relied upon by *Titus* relate, in the main, to waiting period requirements. Moreover, as heretofore emphasized, the cases pertain to the right to take the bar examination, and not to the admission of a foreign attorney.

In Keenan v. Board of Law Examiners of State of N.C., D.C., 317 F.Supp. 1350 (1970), a three-judge court declared unconstitutional a rule of the Board of Law Examiners which provided that, before being certified, an applicant must have been a bona fide citizen and resident of North Carolina for at least twelve months prior to the date of the bar examination. Virginia has no such rule or statute; the only requirement being that the applicant seeking to take the examination be a resident of Virginia at the time he applies and at the time he takes the examination. There were three plaintiffs involved in *Keenan*. The first, Keenan, had graduated from Duke University Law School, had been admitted to practice in Texas and Louisiana, and had become a resident of North Carolina on June 10, 1970, prior to the bar examination to be given in August 1970. No issue was raised as to the *bona fides* of his residence and, along with the other two plaintiffs, he indicated a present intention to remain a permanent resident of North Carolina and to practice law therein. The second, Burnham, graduated from the University of Pennsylvania Law School, was li-

5. The fact that the Rule may result in "incidental individual inequality" does not make it offensive to the Fourteenth Amendment. Phelps v. Board of Education, 300 U.S. 319, 324, 57 S.Ct. 483, 81 L.Ed. 674 (1937).

6. The Board of Bar Examiners is prohibited by § 54–72 from revoking any license issued by it *after* there has been a qualification under it in any state court. In addition to Rule 1A:3 permitting revocation of a license issued without examination, the courts are empowered by §§ 54–73, 54–74, to revoke *any* license to practice law, after hearing, for conviction of a felony, malpractice, corrupt unprofessional conduct, or not being duly licensed.

7. As was pointed out in Potts v. Honorable Justices of Supreme Court of Hawaii, D.C., 332 F.Supp. 1392, 1398 (1971— three judge court): "Not all successful bar applicants practice law after admission. Then too, many states (and United States District Courts) distinguish be-

tween and regulate the respective practice privileges of 'active' members of the bar, i. e., those attorneys who reside in and have an office in the state, and 'inactive' members, i. e., those not so residing in and having an office therein. Such regulations are sufficient to achieve the desired objective of keeping attorneys at all times subject to the authority of the admitting court."

8. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (one-year residency requirement as condition to eligibility for welfare benefits as affected by constitutional right to move from state to state); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed. 2d 675 (1965) (residence qualifications barring armed service personnel who are domiciled and intend to make their permanent home in state); Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (requirement in federal election of filing certificate of residence six months prior to election).

censed to practice law in New York, and was residing therein. Nevertheless, Burnham indicated a present intention to become a permanent resident of North Carolina and practice law therein. The third, Mitchell,[9] was a graduate of Stanford University Law School, resided in California, and had been admitted to practice in California and Iowa. He did not file a formal application to take the bar examination although he, like the others, had indicated his present intention. Keenan and Burnham were granted a preliminary injunction and, pursuant thereto, took and successfully passed the bar examination. The residency requirement of twelve months then affected the issuance of their license.

We find little comfort for the plaintiffs from a careful reading of *Keenan.* Judge Craven, in writing the opinion in *Keenan,* refers to Rinaldi v. Yeager, 384 U.S. 305, 309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), where it is stated:

> "The Constitution does not require things which are different in fact * * * to be treated as though they were the same. * * * Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' "

The crux of the present case lies in the contention advanced by both Titus and Brown which is that capability and fitness to practice law are the *sole* inquiries which a state may make. They rely upon Judge Craven's language in *Keenan*[10] applicable to the right to take the bar examination. As the Virginia Supreme Court has said in upholding the residency requirement *on the date of admission,* "We think that Virginia's interest in the subject of regulating the legal profession is both legitimate and compelling and that our residency rule bears a direct and substantial relation to the object to be attained—to secure to the citizens of Virginia an informed, stable, and responsible bar."[11]

What Titus, at least, seeks to attain is a multi-state bar ruling which will permit any attorney, wherever located, to practice in the fifty states, if the attorney is morally fit and has the capacity to practice law. The "capacity" to practice law, according to both Titus and Brown, can usually be found in their successful passage of a bar examination in a foreign state or the District of Columbia, perhaps coupled with an intention to open an office in the state where they seek admission to practice. We cannot agree that the several states should be so limited bearing in mind that comity or reciprocity is essentially a state discretionary function in determining who should practice a given profession.

In 1969, the Supreme Court, in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), declared invalid the one-year welfare requirements of several jurisdictions insofar as the "waiting period" aspect of residency as a prerequisite to welfare benefits was concerned. What *Shapiro* did not do is

---

9. Mitchell failed to comply with other requirements of the Board and was denied relief.

10. Judge Craven said: "In licensing attorneys there is but one constitutionally permissible state objective: the assurance that the applicant is capable and fit to practice law." He then cites the language in Schware v. Bar Examiners, 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed. 2d 796 (1957), also applicable to the right to take the bar examination. It is significant to note that Keenan and Burnham were not seeking admission to practice under comity or reciprocity, although North Carolina does permit the same under certain conditions.

11. Even Keenan, supra, 317 F.Supp. at 1362, n. 17, states, "We express no opinion upon the constitutional validity of rules requiring residency at the time of examination or of admission or upon the validity of short term pre-admission residency requirements designed to insure personal interviews and contact with the applicant."

to destroy the requirement of residency. In writing for the majority, Mr. Justice Brennan inserted note 21, 394 U.S. 638, 89 S.Ct. 1333, stating:

"We imply no view of the validity of waiting-period or residence requirements determining eligibility * * * to obtain a license to practice a profession * * * and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel."

The closest approach to the issues here presented is in Martin v. Walton, 368 U.S. 25, 82 S.Ct. 1, 7 L.Ed.2d 5 (1961), decided subsequent to *Schware* upon which both Titus and Brown strenuously rely. The dissenting opinion of Mr. Justice Douglas, in which Mr. Justice Black concurred, gives the facts and, if we were to accept the dissent, would directly apply to the plaintiffs herein who are both of good moral character and are proficient in law. The more detailed facts may be obtained by an examination of the Kansas Supreme Court reported *sub nom*, Martin v. Davis, 187 Kan. 473, 357 P.2d 782 (1960). The rule there under attack pertained to the requirement that an attorney, regularly practicing outside of Kansas, was permitted to practice in Kansas only in association with an attorney who had been admitted to the bar of Kansas. The Supreme Court of Kansas pointed out that two classes of attorneys had been created—one involving members of the Kansas bar who were regularly engaged in the practice of law in another state and who were required to associate local counsel—the other including members of the Kansas bar not regularly engaged in the practice elsewhere who were not required to associate local coun-

sel. When the case reached the Supreme Court it was dismissed for want of a substantial federal question. In upholding Rules 41 and 54, the majority stated that neither the rule nor the statute was "beyond the allowable range of state action under the Fourteenth Amendment" and that the reasons given by the Kansas Supreme Court for the rules cannot be disregarded.[12] More significantly, the *per curiam* opinion states:

"Nor does the fact that the Rules may result in 'incidental individual inequality' make them offensive to the Fourteenth Amendment."

While Martin v. Walton, *supra*, has never been reversed or even criticized by the United States Supreme Court, it was the subject of acceptance in Sams v. Ohio Valley General Hospital Association, 413 F.2d 826 (4 Cir., 1969). Circuit Judge Bryan, a member of the present court, writing the opinion for the majority, there said, after quoting from McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393:

"Illustrative of this doctrine are the holdings that if there is a rational basis therefor, separate treatment of professionals even of the same calling is permissible. For instance, finding ground for the difference in standings at the bar, the Court refused to strike down, upon the Equal Protection Clause, Kansas' denial of a resident and licensed attorney's right to practice, with a Kansas associate, in her courts because, although having an office in Kansas, he practiced regularly in Missouri. Martin v. Walton, 368 U.S. 25, 82 S.Ct. 1, 7 L.Ed.2d 5 (1961)."

While perhaps unnecessary in the final determination of the case, Sanders v. Russell, 401 F.2d 241 (5 Cir., 1968), af-

---

12. As the Supreme Court of Virginia observed, if a state may constitutionally deny an attorney, a resident of and licensed in Kansas, the right to appear in its courts without local counsel merely because he regularly practices elsewhere, it follows that a state may deny a foreign attorney the right to appear *pro hac vice* without local counsel and, by the same token, to deny a foreign attorney the right to practice law generally unless he agrees to become a resident upon admission.

firmatively upheld the right to require a foreign attorney to associate local counsel. What the court struck down were two additional requirements to the effect that a *pro hac vice* appearance by an attorney was permitted in only one case during any twelve-month period and a further rule which provided that a foreign attorney could not make a *pro hac vice* appearance in the federal court in Mississippi unless he had been admitted to the bar of another state for at least five years. As Judge Dyer stated, the case did *not* involve the right to practice law in the state courts, or the right to *general admission* to a federal district court, or the right of attorneys to be admitted *pro hac vice without association* with locally admitted counsel. Implicit in the opinion is the fact that the underlying purpose of the district court rule was to unduly limit the appearance of civil rights attorneys from foreign states—a factor which assuredly does not apply to either Titus or Brown. *Sanders* recognizes the valid interest of the district court in regulating the qualifications and conduct of counsel, their availability for service of court papers, and their amenability to disciplinary proceedings. It points out that nonresident lawyers who remain in the state for any significant period of time and who do not confine their practice within the limits of their *pro hac vice* admission are subject to appropriate action for the unauthorized practice of law.

In the Application of Wasserman, 240 F.2d 213 (9 Cir., 1956), Wasserman, a member of the bar in good standing in the Eastern District of Arkansas and the United States Court of Appeals for the Ninth Circuit, applied to the chief judge of the United States District Court for the Southern District of California for permission to practice law *generally* in that court. A rule of the latter court provided that any applicant was required to be a member in good standing of the State Bar of California. Wasserman did not meet this test. While much of the discussion is dicta, the opinion does consider the matter of comity and, in part, states:

"It has never been the rule anywhere that, simply because a person has been admitted to practice in the courts of Indiana, he must automatically be admitted to the courts of New York. * * * Many states do have rules of comity for admission of applicants in good standing from other states, but such rules are not obligatory. If Wasserman were admitted to the courts of the State of Arkansas and resident there, he could by comity do such acts as are recognized by the rules in the United States District Court for the Southern District of California. Admission to appellate courts of the federal system which have territorial limits covering several states or the nation involve different principles."

Tested by these principles, why should a federal court require a state court to approve an application to practice law *generally* under the facts here presented? We decline the invitation to do so.

Plaintiffs' "claim of right" to admission to the bar of Virginia was considered, by analogy, in Brooks v. Laws, 92 U.S.App.D.C. 367, 208 F.2d 18 (1953), where it is said, "There is no inherent right to practice law. The right arises after qualification under the rules has been established."

Titus points out instances of "incidental individual inequality." It is quite true that there are attorneys residing in Maryland, the District of Columbia, and probably West Virginia, Kentucky, Tennessee, and North Carolina, who successfully passed the Virginia bar examination, received their license to practice law and, although not maintaining an office or residence in Virginia at this time, may enter a Virginia court without associating local counsel. It is likewise true that Maryland and District of Columbia attorneys are more conveniently located to courts in Northern Virginia than attorneys located in

Roanoke or Norfolk. But this evades the question. States must have some rules to regulate the practice of law, and even Titus and Brown concede that every practitioner in Virginia could be required to pass the bar examination before practicing in any Virginia court. We do not agree with Titus where he states that he cannot sit in his Maryland office and give a client any advice touching Virginia law. Not every instance involving a transaction tied to Virginia constitutes the practice of law therein. We do not interpret the words "practice law" in such a limited sense.

Both in Lipman v. VanZant, 329 F. Supp. 391 (N.D.Ga., 1970) and Suffling v. Bondurant, 339 F.Supp. 257 (D.N.M., 1972)—three judge court cases—the residence requirements *at the time of admission* were upheld. It is, of course, true that a discussion of these cases points to the fact that the purpose of the residency requirement was to permit an investigation of the applicant. The Supreme Court of Virginia recognized Titus' argument, but pointed out that Titus has said that he does not intend to reside in Virginia at any time and, therefore, he falls within the rule in *Lipman* where an intervenor, residing out of the state, was denied relief but, in a later footnote, the court observed that the intervenor had become a resident of Mississippi and, if otherwise qualified, would be entitled to take the next bar examination.

We see no material distinction in upholding residency requirements at the time of taking a bar examination, and residency requirements for the admission of an attorney by reciprocity. It is our view that, in exercising the discretionary function of admitting a foreign attorney to the bar of Virginia under reciprocity, a residency requirement at the time of admission is not in violation of the Equal Protection Clause, nor does

it impede upon the right to travel. While there appears to be some conflict as to whether the "traditional test" (rational relationship) or "compelling state interest" is appropriate, we agree with the Supreme Court of Virginia that both exist in these cases.

As applied to admission by reciprocity it is a general requirement in most states that the applicant must reside, at the time of his application or admission, in the state in which he seeks admission. 51 A.L.R.2d 1219, § 8(d). With respect to Titus, he would have the courts of Virginia maintain a nonresident bar; certainly a doubtful authority imposed upon any court. Matter of Mosness, 39 Wis. 509, 20 Am.Rep. 55; 51 A.L.R.2d 1219.[13]

■ It is interesting to note that, with respect to both Titus and Brown, they seek admission to practice law generally in Virginia by reason of reciprocity. The statute, § 54–67, of the Code of Virginia 1950, as amended, vests in the Supreme Court of Virginia the *discretion* to grant a certificate without examination. In promulgating Rule 1A:1, the Supreme Court of Virginia merely set forth what requirements were necessary to command the exercise of its discretion. Assuming arguendo that the residency and full-time practice of law requirements are unconstitutional, are we not back to the exercise of discretion which is permissive and not mandatory unless, of course, the discretion so exercised is arbitrary, unreasonable or discriminatory? As applied to a request for a certificate of registration as a professional engineer, Virginia has had occasion to consider the permissiveness granted under reciprocity in Spindel v. Jamison, 199 Va. 954, 103 S.E.2d 205 (1958). There is no vested right imposed by law. In Mercer v. Hemmings, (Fla.) 194 So.2d 579, 582, it was held that out-of-state certified public ac-

13. It is unnecessary to consider the reasoning in Virgin Islands Bar Ass'n v. Dench, 124 F.Supp. 257 (D.V.I., 1953), appeal dismissed 215 F.2d 810 (3 Cir., 1954), where the district court pointed out that an attorney is a quasi-state officer and one cannot be an officer of two different state courts at the same time.

countants had no vested right to have the Florida state board of accountancy issue certificates merely because the persons applying for same held certificates granted by proper authorities in other jurisdictions.

While in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the Supreme Court rejected as unconstitutional a *durational* residence requirement of one year as a prerequisite to vote, the court emphasized the difference between *bona fide* residence requirements and *durational* residence requirements, and stated clearly that a state had the light to impose standards of *bona fide* residence in voting rights cases. We think that Virginia has acted rationally and with a compelling state interest in insisting that any foreign attorney, seeking to practice law *generally*, as contrasted with his association with local counsel on a case-by-case basis, must express an intention to reside permanently in Virginia and devote his full time to the practice of law therein. Indeed, we know of no other means to achieve the goal of a responsible bar in a particular state.

It is difficult to follow the argument that Rule 1A:1 impedes the right of travel. Any foreign attorney has the right of travel to and from Virginia. The Rule touches only his right to appear in court and practice law *generally* in Virginia.

In addition to the illustrations suggested by the Supreme Court of Virginia, it is now a recognized fact that some attorneys, especially in the criminal field, have attained a marked degree of fame by reason of publicity in certain cases. Because of their extensive litigation, it has become increasingly difficult to schedule matters for hearing and trial and, without having local counsel, it would result in state and federal courts exercising presumably arbitrary action in forcing matters to trial. Control over the docket would be next to impossible. The foreign attorney would assuredly not be amenable to a court appointment as counsel for an indigent person. Under like reasoning even Brown, a resident of Virginia but employed in a full-time position in the District of Columbia, could hardly be required to respond to the call of such an appointment. While a court might have the legal right to call upon either Brown or Titus, it is highly unlikely that such a call would be forthcoming as to an attorney residing in Montgomery County, Maryland, or an attorney who works from 9:00 a. m. to 5:00 p. m. in another jurisdiction and is not readily available. The requirements that an attorney be a resident of Virginia and practice full time in the Commonwealth tend to rationalize the treatment of all practicing attorneys on an equal basis.

True, residence, standing alone, is no guarantee of availability in emergencies. Nor does it necessarily follow that the residency rule is entirely justified in terms of client protection. The high ethical standards of an attorney can best be maintained after practice begins if all members of the bar have a stake in the community. Lawyers are frequently leaders in the community and a resident attorney will have a continuing interest in the success of local society and the quality of community life by reason of the fact that his family generally resides in the area. Moreover, the residence reinforces the attorney's interest in his reputation. While assuredly not applicable to either Titus or Brown, there are attorneys admitted to practice who sometimes are subject to rather dubious ethical acts, and a resident attorney may be confronted with informal community sanctions which may be effective even though formal sanctions are not taken. While it is acknowledged that an attorney may reside and work in separate locales within the state, the vast majority of the attorneys are an integral part of the community wherein they maintain an office.

Familiarity with local legal nuances is assured by the requirements of residence and full-time practice of law. Some attorneys, Brown and Titus in-

cluded, have sufficient wisdom to grasp local customs and practices which vary to some extent in each city and county in Virginia. Other attorneys, perhaps seeking admission by reciprocity from a state where the admission requirements are notably low, are unable to cope with such legal nuances and a general knowledge of the law of the state to which they seek admission. There are cogent reasons for vesting a wide discretion as to admission under the rules of comity. Acknowledging that there are many practicing attorneys who should be employed in some other field of endeavor, it nevertheless follows that the state has a very substantial interest in regulating the practice of law within its confines. Rules cannot be adopted merely to accommodate the most capable and ethical attorneys.

 Plaintiffs direct our attention to the recently decided abortion cases.[14] A careful reading of these opinions leads us to the conclusion that they are wholly inapposite. It is true that the "compelling state interest" test was there applied in determining that an abortion, committed within the trimester period following pregnancy, was solely a matter for the patient and her licensed physician. In essence, *Roe* declared that a "fundamental" right [15] was vested in the expectant mother, thus requiring the application of the "compelling interest" test. As to the residency requirement of the prospective mother in *Doe*, in considering the right of travel the majority opinion significantly points out that, while invalid as to the performance of the abortion, "a requirement of this kind, of course, could be deemed to have some relationship to the availability of post-procedure medical care for the aborted patient." What the Supreme Court did not approve was a potential limitation to the residents of a state of general medi-

cal care available within its borders. But, as heretofore noted, the right to welfare payments under Shapiro v. Thompson, *supra*, and the right to medical treatment under *Doe*, constitutes a marked distinction to the purported claims of these plaintiffs. And while we agree that the conception of "liberty" should not be limited to freedoms explicitly named in the Bill of Rights, we cannot conclude that Rule 1A:1 of the Supreme Court of Virginia is an arbitrary or purposeless restraint upon liberty or the right to travel. Nor does differing treatment between persons taking a bar examination and those seeking to practice law generally under the principles of comity or reciprocity constitute a violation of the Equal Protection Clause, as that clause has never been construed to require equal treatment of all persons despite differing circumstances.

For the reasons herein stated, an order will be entered dismissing these actions with costs assessed against the plaintiffs.

MERHIGE, District Judge (dissenting in each of said cases).

Because my view of the facts of these cases and the law applicable thereto causes me to reach a conclusion different than that expressed by my colleagues, I must respectfully dissent.

My view of the case is that the issue presented is not whether the residency rule of which Titus complains or the requirement that an applicant for admission open an office for the full-time practice of law, of which Brown complains, is related to a legitimate state interest. Admittedly the State of Virginia has the right to establish standards governing the admission of attorneys to practice law, provided in so doing it does not exclude a person from the practice of law or from any other occupation in a

---

14. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (both decided on January 23, 1973).

15. In our opinion there is no "fundamental right" of a foreign attorney to practice law in every state merely because he is capable and of good moral character.

manner or for reasons that contravene the due process or equal protection clause of the 14th amendment to the Constitution. See Schware v. Board of Law Examiners, 353 U.S. 232, 238–239, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).

My difficulty in concurring with the majority opinion is that I view the issue to be whether the different treatment accorded reciprocity applicants, such as the named plaintiffs herein, vis-a-vis those who are admitted by virtue of taking the bar examination bears any rational basis related to a legitimate state interest.

The Supreme Court of Virginia has stated that the object of the rule in question is to secure to the citizens of the State of Virginia an informed, stable, and responsible bar. See Application of Titus, 213 Va. 289, 191 S.E.2d 798, at 802. Where a state declares the purpose of a rule or law, no room is left to conceive of any other purpose it may serve. See Martin v. Walton, 368 U.S. 25, 28, 82 S.Ct. 1, 7 L.Ed.2d 5 (1961). It seems to me that the majority opinion dismisses the separate classifications set up by Virginia, by virtue of its treatment of those seeking admission to practice law by reciprocity as distinguished from those seeking to practice law by virtue of taking the bar examination, with the bland statement, "There is a rational basis for making separate classifications, [and that] . . . [q]uantitatively and qualitatively there is a solid basis for the distinction drawn." The discussion that follows thereafter makes no further mention of the separate classifications but simply seeks to show that the requirements of Rule 1A:1 are related to a legitimate state interest.

I repeat I have no argument with this conclusion. My difficulty arises from my view that there is nowhere contained in the majority opinion a basis for treating the classifications differently, nor can I conceive of any. It seems to me beyond question that the purposes which Virginia seeks to achieve both by application of the rule in question and

Code Section 54–74 are identical—to secure to the citizens of Virginia an informed, stable, and responsible bar. It follows, therefore, that the purposes for the rule and the statute being identical, the requirements imposed upon foreign attorneys seeking to be admitted under the rule, when compared with the requirements imposed by virtue of Virginia Code Section 54–74 relating to admission by examination, are so different and unrelated to the purposes assigned as to be invidiously discriminatory.

The equal protection clause requires more of a state law than nondiscriminatory application within a class it establishes. See Rinaldi v. Yeager, 384 U.S. 305, 308, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1965). There is also imposed a requirement of some rationality in the nature of the class singled out. A classification must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed and can never be made arbitrarily and without such basis. See McLaughlin v. Florida, 379 U.S. 184, at 190, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

Judicial inquiry under the equal protection clause does not end with the showing of equal application among the members of the class affected by Rule 1A:1. Courts are bound to reach and determine the question whether the separate classifications are reasonable in light of the purpose. I am fully cognizant of the rule of law that requires the widest discretion to be afforded the separate classifications established as here, but even giving the benefit of every conceivable circumstance which might suffice to characterize the separate classifications as reasonable rather than arbitrary and invidious, bearing in mind the purposes of the licensing procedures as pronounced by the Virginia Supreme Court and the different treatment of the classes, I find no rational basis for the separate classifications and the treatment afforded the members of the respective classes.

In the one class, that is, those admitted by examination, there is no requirement that they be residents of the State of Virginia in order to practice law. The only requirement as to residency in that regard is that a prospective licensee be a "resident of this state at the time his application to take the examination was filed with the board and intends to continue as a resident of this state *to the time of taking the examination for which he applies* . . . " As to a reciprocity applicant, he must be a resident and intend to so remain, for there is a provision to remove him from the rolls should he not do so. There is no provision whatsoever relating to a successful bar examinee opening an office for the full-time practice of law. Indeed, over twenty-five percent of the members of the Virginia Bar, the vast majority of whom were admitted by examination, not only fail to reside within the state but have no office within the state. There is no requirement even that they maintain an office, nor is there any restriction as to what the majority refers to as "moonlighting." Yet that twenty-five percent, upon the mere payment of a *de minimis* license fee each year, have the right to practice law in Virginia while others, admittedly qualified, one of whom at least lives within commuting distance of Virginia, and the other a resident of Virginia, are precluded from exercising the practice of their chosen profession.

I am in full accord with the majority's statement that the Constitution does not require things which are different in fact to be treated in law as if they were the same. I think, however, in the instant case the majority loses sight of the principle that the equal protection clause does require that in defining the separate classes the distinctions that are drawn must have some relevance to the distinction for which the classification is made. I am in full accord with the views expressed by Judge Craven in Keenan v. Board of Law Examiners of North Carolina, D.C., 317 F.Supp. 1350 (1970), citing Schware v. Bar Examiners, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957), that the only legitimate and constitutionally permissible state objection in the licensing of attorneys is whether "the applicant is capable and fit to practice law . . . " This is the identical purpose assigned by the Virginia authorities, i. e., to secure an informed, stable, and responsible bar.

I find nothing in either the Supreme Court of Virginia's opinions relating to the instant matter or in the majority opinion to justify the separate classifications. To simply say quantitatively and qualitatively there is a solid basis for the distinction drawn is to reach a conclusion without assigning the reasons therefor. Arbitrary selection can never be justified by calling it classification. See McLaughlin v. Florida, *supra,* 379 U.S. at 190, 85 S.Ct. 283. There is nothing magic about the phrase "invidious discrimination; " what it encompasses as applied to this case is a classification which rests on grounds wholly irrelevant to the state's objective. See McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). To reach the same objective, applicants who take and pass the bar examination are treated differently than qualified reciprocity applicants, and this is discriminatory.

I deem it unnecessary, in view of the majority's holding that the test to be applied is one of a rational basis as distinguished from a compelling state interest, to prolong this dissent, except to note that as I view the case, there being no rational basis for treating the classes differently, obviously such treatment could not pass the strict requirements of the compelling state interest.